UNITED STATES of America, Plaintiff,

v.

Daniel Howard HARMON, Jr., Defendant.

No. LR–CR–97–7(1).

United States District Court,
E.D. Arkansas,
Western Division.

March 3, 1998.

Dan Stripling, U.S. Attorney's Office, Little Rock, AR, for Plaintiff.

Léa Ellen Fowler, Little Rock, AR, for Defendant.

## MEMORANDUM ORDER

REASONER, Chief Judge.

On May 14, 1997, a federal grand jury sitting for the Eastern District of Arkansas returned a Third Superceding Indictment against the defendant, Daniel H. Harmon, Jr. Mr. Harmon is the former prosecuting attorney for the Seventh Judicial District of the State of Arkansas.

The Third Superceding Indictment brought the following charges against Mr. Harmon: Count 1 charged the defendant with committing a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);[1] Counts 2 and 5 charged the defendant with possession with intent to distribute a Schedule II controlled substance in violation of 21 U.S.C. § 841(a)(1); Counts 3, 4, 7 and 9 charged the defendant with conspiracy to commit extortion in violation of 18 U.S.C. § 1951(a); Count 6 charged the defendant with conspiracy to manufacture a Schedule II controlled substance in violation of 21 U.S.C.

---

1. Mr. Harmon was charged with eleven distinct racketeering acts under Count 1. Each racketeering act, with the exception of Racketeering Act 11, was charged as a separate substantive count of criminal activity in that same Indictment.

§ 841(a) and § 846; Count 8 charged the defendant with conspiracy to possess with intent to distribute a Schedule I controlled substance in violation of 21 U.S.C. § 841(a)(1) and § 846; Count 10 charged the defendant with witness tampering in violation of 18 U.S.C. § 1512(b)(1) and Count 11 charged the defendant with retaliation against a federal informant in violation of 18 U.S.C. § 1513(b)(2).

After severance of his case from that of his co-defendants, Mr. Harmon proceeded to trial before a jury commencing on May 27, 1997. On June 11, 1997, he was convicted on Counts 1, 4, 7, 8 and 9 of the Third Superseding Indictment. On the remaining counts, Mr. Harmon was acquitted.

Following Mr. Harmon's conviction, a Presentence Report ["PSR"] was prepared by the United States Probation Office. Defendant's attorney timely raised numerous objections to the PSR. Among the exceptions was an objection to the application of United States Sentencing Guideline ["U.S.S.G."] § 2B3.2 to the § 1951(a) convictions ["Hobbs Act" convictions].[2]

Pursuant to U.S.S.G. § 2E1.1, a racketeering violation—such as that for which defendant Harmon was convicted—is assigned the greater of a base offense level of 19 or the offense level applicable to the underlying racketeering act. *See* United States Sentencing Commission, *Guidelines Manual*, § 2E1.1 (Nov.1995). To determine the appropriate sentence, therefore, one must first calculate the offense level of the underlying racketeering act and compare that offense level with the alternative minimum base offense level applicable to RICO violations, i.e., a base offense level of 19. As stated previously, the greater of these represents the base offense level applicable for RICO viola-

tions. Because the RICO charge under which defendant Harmon was convicted contains more than one underlying offense, it is appropriate to treat each underlying offense as if contained in a separate count of conviction for the purposes of this comparison. *See* U.S.S.G. § 2E1.1, comment. (n. 1).

With regard to the calculations performed on the Hobbs Act violations pursuant to 18 U.S.C. § 1951(a),[3] a base offense level of 18 was established. To this level, various enhancements were added, resulting in an adjusted offense level of 35. To his adjusted offense level, the defendant was assigned "units" for the other racketeering acts under U.S.S.G. § 3D1.4, as is proper for non-grouped charges. The defendant received a total of one unit, which correspondingly increased the adjusted offense level by one, for a total offense level of 36. This total offense level was predicated upon the Probation Office's use of U.S.S.G. § 2B3.2, which is entitled "Extortion by Force or Threat of Injury or Serious Damage."

The defendant objects to the Probation Office's application of § 2B3.2 to his Hobbs Act convictions and argues that § 2C1.1 should have been applied in its stead. Section 2C1.1, entitled "Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right," establishes a base level offense of 10.[4] Under this guideline, the defendant would receive an enhancement of 2 levels under § 2C1.1(b)(1) for conduct involving more than one act of extortion and an enhancement of 6 levels under § 2C1.1(b)(2)(A) for the amount of money involved.[5] In addition, the defendant would receive an adjustment of 4 levels for his role in the offense under § 3B1.1. Thus, the defendant would be facing an adjusted offense

---

2. Defendant's other objections to the PSR will be resolved by the Court at Mr. Harmon's sentencing.

3. Section 1951 provides, in pertinent part:

   (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under

this title or imprisoned not more than twenty years, or both.

4. In addition, under § 2C1.1, it is improper to add a two-level enhancement pursuant to § 3B1.3 for abusing a position of trust. *See* U.S.S.G. § 2C1.1, comment. (n. 3).

5. Defense counsel also objects to the probation office's assessment of the amount of loss. This may be a point to be argued at sentencing. However, for purposes of this order, the Court will utilize the probation office's amount of loss.

level of 22 for the Hobbs Act violations. Finally, he would receive 2 units under § 3D1.4, which would correspondingly increase his adjusted offense level by 2, for a total offense level of 24. If this guideline were utilized for the Hobbs Act violations, the result would be that one of the other, lower-base-offense-level charges would be utilized for purposes of the calculation under § 2E1.1, i.e., establishing the RICO base offense level.

As the difference of 12 points between the application of these two guidelines is significant, the Court held a formal hearing on this matter and requested that the parties submit post-hearing briefs. Deciding the base offense level prior to sentencing will both simplify the sentencing process and provide a more comprehensible record for appellate purposes, in the event either party desires to pursue same.

When the Federal Sentencing Guidelines took effect in November of 1987, they were intended as a means of enhancing the criminal justice system's ability to combat crime through an effective, fair sentencing system. At the heart of the movement to enact the Guidelines was one basic proposition—narrowing a perceived disparity in sentences imposed for similar criminal offenses committed by similar offenders. Although the Guidelines were intended to simplify the sentencing process, this Court—as many others—often finds this goal to be overly optimistic, as well as somewhat illusive. Such is the case currently before the Court.[6]

In determining which offense level guideline to apply, the Court is to "[d]etermine the offense guideline section ... *most applicable* to the offense of conviction (*i.e.* the offense conduct charged in the count of the indictment or information of which the defendant was convicted)...." U.S.S.G. § 1B1.2(a) (em-

phasis added); *United States v. Lambert,* 994 F.2d 1088, 1091 (4th Cir.1993). As the *Lambert* court noted, Guideline 1B1.2(a)'s " ... simple command can generate at least two difficult situations: first, the charged misconduct may be so unusual that it doesn't fall within the express terms of *any* guideline; and second, it may appear to fall under the express terms of *more than one guideline."* *Lambert,* 994 F.2d at 1091–92 (original emphasis). In the latter case, a district court's guiding beacon is the Commission's choice of the phrase "most applicable." *Id.* The defendant was convicted of Counts 4, 7 and 9 under the Hobbs Act. Therefore, the Court must closely scrutinize each of these counts. The Court must also refer to Count 1 of the Third Superceding Indictment, which was the overall RICO charge.

As previously noted, Dan Harmon was the elected Prosecuting Attorney for the Seventh Judicial District of the State of Arkansas. In his capacity as Prosecuting Attorney, he was the applicant for federal funding of the Seventh Judicial District Drug Task Force, and was responsible for administrative and financial matters of the Drug Task Force. The Seventh Judicial District Drug Task Force was a combination of law enforcement agencies within the Seventh Judicial District. The goal of the Drug Task Force was to enhance, through jointly controlled operations, the ability of federal, state and local criminal justice agencies to remove specifically-targeted major drug trafficking offenders. Count I of the Third Superceding Indictment charged Dan Harmon with operating the Prosecuting Attorney's Office for the Seventh Judicial District as a racketeering enterprise to obtain monetary benefits for himself and others, and to participate in, and conceal, illegal activities.[7] In further-

---

**6.** As if anticipating the future criticism it was to endure, the United States Sentencing Commission was quick to add the disclaimer that "[a] sentencing system tailored to fit every conceivable wrinkle of each case would quickly become unworkable and seriously compromise the certainty of punishment and its deterrent effect." *See* United States Sentencing Commission, *Guidelines Manual,* Ch. 1, Pt. A. (Nov.1995).

**7.** Also indicted in Count 1 was Roger Walls, the former Administrator of the Seventh Judicial Dis-

trict Drug Task Force, and William Murphy, a criminal defense attorney practicing in that District. Upon motion by the United States, the RICO charges against both Walls and Murphy were dismissed. Pursuant to a jury verdict returned on January 14, 1998, Mr. Walls was convicted of the Varnado extortion conspiracy under Count 7 and acquitted of the charges under Count 6. In exchange for Mr. Murphy's guilty plea in a separate criminal proceeding, all charges pending against him in the present case were dismissed.

ance of the operation of this alleged criminal enterprise, defendant Harmon was accused of four separate acts of extortion of which the defendant was convicted of three.

Under Count 4 of the Third Superceding Indictment, Mr. Harmon was charged with, and convicted of, extorting $50,000 from drug offenders Kay LaJean O'Brien and Freddie McCaslin. In exchange for the $50,000, possible drug charges against Ms. O'Brien would not be pursued and pending charges against Mr. McCaslin would be dismissed. Specifically, Count 4 charged that Mr. Harmon, along with Bill Murphy,

> ... conspired with each other to affect interstate commerce by extortion in that they did conspire to extort ... approximately $50,000 in United States currency not due and owed to them individually or by virtue of their office or employment from Fred Stephen McCaslin and LaJean O'Brien, *with their consent, which consent has been induced by wrongful use and threat of use of force, violence, and fear, and under color of official right.*

(Emphasis added).

Count 7 set forth a charge of extortion against Mr. Harmon and Roger Walls involving an individual named Ernest Varnado. On December 16, 1992, Mr. Varnado was arrested for possession of a controlled substance in the Seventh Judicial District of Arkansas. After Mr. Varnado's post-arrest release, Mr. Harmon and Mr. Walls " ... without an extradition proceeding, traveled to Varnado's home in Fort Worth, Texas, took him into custody, and returned him to Arkansas." *See* Third Superceding Indictment, p. 16.

The crux of this charge is that Varnado was brought back to Arkansas by Harmon and Walls without proper extradition proceedings. Further, Mr. Varnado was taken by the defendants to the Grant County Jail, instead of the Saline County Jail where his charges were pending. Upon payment of $3,000 to defendants Harmon and Walls, Mr. Varnado was released. During the summer of 1993, Mr. Harmon demanded additional payments from Ernest Varnado. Harmon advised Mr. Varnado that if such payments were not made, Mr. Varnado would be incarcerated again. Count 7 officially charged that defendants Harmon and Walls

> ... conspired with one another to affect interstate commerce by extortion in that they did conspire to extort ... approximately $5,500 in United States currency not due and owed to them individually or by virtue of their office or employment from Ernest Varnado, *with his consent, which consent had been induced by wrongful use and threat of use of force, violence, and fear, and under color of official right.*

(Emphasis added).

Finally, Count 9 charged defendants Harmon and Walls with extorting money from an individual named Patrick Davis, who was arrested for possession of marijuana in the Seventh Judicial District of Arkansas. According to the Indictment, Mr. Harmon had a meeting with Mr. Davis wherein Mr. Harmon told Davis that if he would make a $10,000 payment to Mr. Harmon, the charges against Mr. Davis would be dismissed.

When Patrick Davis' wife, Tina Davis, appeared at Mr. Harmon's office with the $10,000, Mr. Harmon told Ms. Davis that Patrick would not be released unless she obtained more money or engaged in sexual activity with Mr. Harmon. Ms. Davis declined to accept either alternative and instead paid Mr. Harmon the $10,000. Eventually Patrick Davis was released. In securing Mr. Davis' release, both Patrick and Tina Davis were required to sign a disclaimer to the $10,000. The disclaimer falsely stated that they had both been arrested with the currency on March 3, 1993 and that they were forfeiting the money.

Count 9 utilized the same language employed in Counts 4 and 7. Count 9 formally alleged that Harmon and Walls

> conspired with each other to affect interstate commerce by extortion in that they did conspire to extort ... $10,000 in United States currency not due and owed to them individually or by virtue of their office or employment, from Patrick Davis and Tina Davis, *with their consent, which consent had been induced by wrongful use and threat of use of force, violence, and fear, and under color of official right.*

(Emphasis added).

In reviewing the extortion counts under which defendant Harmon was convicted, the

Court finds each count charges that the defendant would not proceed with a criminal prosecution in exchange for a monetary payment. Pursuant to Arkansas Code Annotated Section 16–21–103, it is the duty of the Prosecuting Attorney to commence and prosecute all criminal actions in which the state or any county in his district may be concerned. Misfeasance or nonfeasance in the performance of such duties, which is motivated by a corrupt purpose, appears to be exactly the type of situation contemplated by § 2C1.1. Although the Third Superceding Indictment charged both extortion under use of violence and under color of official right, the jury was only instructed as to extortion under color of official right. The instructions made no mention regarding the use of threats or force. These instructions were given without objection by either party.

Looking first at the express language of the two possible guidelines, the Court notes that § 2B3.2 generally speaks in terms of "strong-arm" extortion tactics. For example, § 2B3.2 and the applicable commentary reference such things as threats of death, bodily injury, kidnaping, driving an enterprise out of business and the use of firearms. However, Application Note 2 specifically states:

> This guideline applies if there was any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, *or any comparably serious threat*, such as to drive an enterprise out of business. Even if the threat does not in itself imply violence, the possibility of violence *or serious adverse consequences* may be inferred from the circumstances of the threat or the reputation of the person making it. An ambiguous threat, such as 'pay up or else,' or a threat to cause labor problems, ordinarily should be treated under this section.

Application Note 2 to U.S.S.G. § 2B3.2 (emphasis added).

The Government relies on the emphasized language from this note to support application of § 2B3.2 to the defendant's Hobbs Act convictions.[8] According to the United States, the threats made by Dan Harmon, both those that were direct and implied, were that the extortion victims would be sent to prison and would be denied due process in the course of their prosecution. In addition, the Government argues that Mr. Harmon impliedly threatened to seek the maximum possible sentences for these offenders if they did not pay him the stated amounts of money.[9] The Government contends that all of these repercussions are the type of "comparably serious threats" and "serious adverse consequences" contemplated by Note 2 to § 2B3.2.

By contrast, the express language of § 2C1.1, speaks in terms of "bribery" and "influencing elected officials." Further, § 2C1.1(c) cross-references the reader to § 2B3.2 by directing "[i]f the offense involved a threat of physical injury or property destruction, apply § 2B3.2 (Extortion by Force or Threat of Injury or Serious Damage) if the resulting offense level is greater than that determined above." The clear implication from this note is that it is improper to look to § 2B3.2 in public official extortion cases *except* those involving threats of physical injury or property destruction. *See also,* U.S.S.G. § 2C1.1, comment. (backg'd) (stating that "... if the offense involved forcible extortion, the guideline from § 2B3.2 ... will apply if the result is greater than that determined above.").

Additionally, the commentary to § 2C1.1 provides much-needed guidance regarding the issue at hand. First and foremost, Application Note 1 makes clear that § 1C1.1's reference to "official holding a high-level decision-making or sensitive position" includes prosecuting attorneys. Secondly, the Background Notes provide a non-exclusive list of conduct which is prosecutable under the

---

8. The Court notes that the Guideline commentary serves many purposes, one of which is to interpret the guideline or explain how it is to be applied. U.S.S.G. § 1B1.7. Additionally, failure to follow such commentary could constitute an incorrect application of the guidelines, subjecting the sentence to possible reversal on appeal. *Id; United States v. Kelley,* 956 F.2d 748, 756 (8th Cir.1992).

9. However, after diligently searching the record, the Court is unable to find any definitive proof that Mr. Harmon threatened to seek the maximum possible penalties against his extortion victims.

Hobbs Act and which falls under § 2C1.1 for sentencing purposes. According to these notes, this type of conduct varies from a city building inspector who demands a small amount of money from the owner of an apartment building to ignore code violations to a state court judge who extracts substantial interest-free loans from attorneys who have cases pending in his court. Finally, the commentary states that this Guideline applies to a public official who solicits or accepts a bribe for a corrupt purpose, such as to direct or influence his official actions.

The parties have cited the Court to various cases from around the country in support of their respective arguments. However, none of the cited cases are exactly on point with the issue at bar. The Government argues that the case of *United States v. Shyllon,* 10 F.3d 1 (D.C.Cir.1993), *cert. denied,* 510 U.S. 1206, 114 S.Ct. 1327, 127 L.Ed.2d 675 (1994), governs the facts presently before the Court. The Court disagrees.

In *Shyllon,* the defendant was a tax auditor who was responsible for selecting and auditing businesses for compliance with local tax laws. The Government indicted Mr. Shyllon under the Hobbs Act, alleging that Shyllon had intimidated four small business owners and succeeded in extorting payments from some of them by threatening audits and fines. Mr. Shyllon was convicted for the Hobbs Act violations. At his sentencing, the district court applied § 2B3.2 to the conduct for which the defendant was convicted. On appeal, Shyllon argued that the lower court should have applied § 2C1.1. In that case, the United States Court of Appeals for the District of Columbia affirmed the lower court's ruling in applying § 2B3.2. In doing

so, the court found that the threats of Shyllon, i.e., threatening to put the victims out of business, were explicitly covered by the application notes to § 2B3.2. In the present case, however, no such equivalent threats were made by Mr. Harmon.

■ The parties have not directed the Court to any precedential opinion regarding whether the type of criminal conduct committed by defendant Harmon satisfies the requirements of § 2B3.2. In the absence of such authority—binding or persuasive—this Court finds that it does not. This Court finds that § 2B3.2 is only applicable in Hobbs Act cases where the public official committing extortion utilizes forcible tactics such as threatening bodily injury, substantial economic harm and/or serious property damage. *See United States v. Hummer,* 916 F.2d 186, 194 (4th Cir.1990), *cert. denied,* 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 670 (1991) (stating that the language of Note 2 to § 2B3.2 causes one to draw a reasonable inference that the Commission contemplated extortion threats to harm one or a few persons, to damage property, or to economically injure or ruin a business).

Such harm was not threatened by defendant Harmon.[10] In the present case, therefore, defendant's conduct falls outside the heartland of § 2B3.2 and the guideline which is "most applicable" is U.S.S.G. § 2C1.1. In exchange for monetary payments Mr. Harmon forewent his sworn official duty to prosecute offenders of the laws of the State of Arkansas.[11] None of the victims of Mr. Harmon's extortion tactics were even arguably innocent of criminal activity. Thus, the conduct of the defendant falls squarely within the parameters of § 2C1.1.[12]

**10.** The Government attempts to argue that defendant Harmon did threaten substantial economic harm if payments were not made. However, the economic harm to the victims of Mr. Harmon's extortion tactics was merely incidental. *Compare United States v. Penn,* 966 F.2d 55 (2d Cir. 1992) (holding that § 2B3.2 was the applicable guideline where the defendant threatened to drive the victim's service station out of business if monetary payments were not made). The real "threat" by Dan Harmon was the possibility (or the probability) of the victims being prosecuted for their criminal conduct, as each properly should have been.

**11.** The Court notes that this case is distinguishable from that of *United States v. Williams,* 952

F.2d 1504 (6th Cir.1991). In *Williams,* the defendant was convicted of extortion under the Hobbs Act for using a sheriffs influence to block a third party's re-zoning efforts. Williams argued that the sentencing court should have applied § 2C1.1 instead of § 2B3.2. The appellate court found, however, that the sheriff, whose political force was the weapon employed by the defendant, was to be bribed in a matter not involving his official actions, for he was not a member of the city planning commission. *Id.* at 1514.

**12.** The incident wherein Tina Davis was propositioned by the defendant for sexual activity presents a different type of situation. However, the

■ At long last, this Court's odyssey into the Sentencing Guidelines approaches its end. In reaching its conclusion, the Court returns to the beginning of its analysis. The goal of the Sentencing Guidelines, be it attainable or not, is to provide similar sentences for similar offenders of similar crimes. In order to achieve this goal, the Sentencing Commission has created distinct guideline provisions which establish "heartlands" of criminal activity. To attain uniformity of sentences, district courts must adhere to the heartlands established by the Commission and sentence offenders in accordance with the perceived similarity of the crime charged in the indictment and the guideline provision ultimately utilized.

As directed by the United States Sentencing Commission, lower courts are to apply the "most applicable" guideline provision to a specific offense. This Court's finding with regard thereto can be condensed down to one salient fact: Fitting the defendant's conduct under § 2B3.2 required the Court to stretch the language of that particular guideline and its commentary, while fitting the illegal activity under § 2C1.1 did not.

The Probation Office is directed to revise its Presentence Report in accordance with the opinion of the Court expressed herein.

consequences threatened by Harmon for Ms. Davis' noncompliance was the prosecution of her