UNITED STATES of America,

v.

Troy Phillip DOCK, et al., Defendants.

No. 4:02–CR–62.

United States District Court,
E.D. Texas,
Sherman Division.

Nov. 12, 2003.

Jaime Alberto Pena, U.S. Attorney's Office, Sherman, TX, for U.S. Government.

Jose Monsivais, Federal Defender's Office, Sherman, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER ON GOVERNMENT'S OBJECTIONS TO PSR

LEONARD DAVIS, District Judge.

This case arises out of Defendants Troy Phillip Dock ("Dock") and Jason Steven Sprague's ("Sprague") (collectively "Defendants") ill-fated attempt to transport approximately 50 undocumented aliens from El Paso to Dallas, Texas on July 27, 2002 resulting in the deaths of two of the aliens.[1]

### BACKGROUND

On July 26 and 27, 2002, Defendants were truck drivers for Boyd Logistics, Inc. They received an initial payment of $3,800.00 from certain indicted co-defendants for transporting the aliens with the remainder of their fee to be paid upon completion of the trip. Certain indicted co-defendants informed some of the aliens that they would be transported in a refrigerated or ventilated trailer, while other aliens were informed that they would ride in the cab of the truck. Desiring to ride in the cab of a truck due to his age and physical condition, Jose Gaston ("Gaston"), one of the decedents in this case, paid more than the other aliens so that he would be provided this accommodation. Certain indicted co-defendants also told the aliens to not make any noise when they stopped at a border patrol checkpoint in Sierra Blanca, Texas, southeast of El Paso.

Defendants transported most of the aliens, including Gaston, in the unrefrigerated and unventilated trailer portion of their tractor-trailer rig.[2] The trailer Defendants used was fully loaded with medical supplies, specifically medical tubing packed in cardboard boxes. The aliens were crammed in a two to three foot space between the top of the load and the ceiling of the trailer. In order to load the aliens into the trailer, Sprague had to break the seal, which had been placed on the trailer doors by Boyd Logistics. The rear trailer doors were the only opening to the otherwise unventilated trailer. Prior to leaving El Paso, one of the Defendants placed a padlock on the trailer doors. The aliens were told not to eat or drink anything for several hours prior to the trip because they would not be stopping.

The aliens were supposed to have been loaded and the trip begun at 8:00 p.m. on July 26, 2002, but Defendants had some mechanical difficulty with their rig and did not arrive to pick-up the aliens in Chaparral, New Mexico until after midnight. The aliens were loaded into the trailer between 12:30 a.m. and 1:20 a.m. on July 27, 2002. Sprague drove the truck from Chaparral

---

1. This factual recitation is derived primarily from the Presentence Investigation Report prepared in this case and the evidentiary hearing held on October 7, 2003.

2. Defendants permitted three women and four toddlers to ride in the sleeper portion of the cab of the tractor.

to the border in El Paso and crossed into Mexico on foot to look for Dock. During this period, Sprague also gave a portion of the money he had been paid to his wife who lives in Mexico. Apparently, while Sprague was doing these things, the truck and trailer with the aliens locked inside sat in El Paso for almost two hours before leaving for Dallas.

The trip from El Paso to Dallas took approximately 10 hours. Defendants did not open the doors or otherwise check on the aliens during this entire time. Around 10:00 a.m. the temperature in the trailer began to rise. As it got hotter and hotter many of the aliens began to shed their sweat drenched clothes. Temperatures in the sealed trailer reached at least 150 degrees.[3] Because of the extreme heat, many victims fainted, vomited, and experienced hallucinations. Some of the victims attempted to get air by ripping wood paneling off the walls of the trailer. Another used a pair of barber scissors in a futile attempt to gouge holes in the metal wall of the trailer. Others tore some of the door gasket away trying to get air through the crack by sticking plastic medical tubing from the cargo boxes through the crack. Although some of the aliens brought a few jugs of water into the trailer, they ran out of water quickly as the temperature rose. Some of them even urinated into their empty water bottles and then drank their own urine in an effort to survive. In summary, the aliens endured a "living hell" for many hours as the trailer in which they were locked proceeded toward Dallas. Their screaming and pounding on the walls for help was to no avail.

About 2:30 p.m. Defendants pulled into a Love's truck stop in Dallas. As Defen-dants exited their air conditioned cab, they heard the victims screaming and hitting the walls of the trailer. Sprague unlocked the padlock and opened the doors to the trailer. The aliens came tumbling, falling and jumping out of the trailer. Those who were able scattered in search of water and in fear of being arrested, but more than half of the aliens were so ill they had to be hospitalized, and two died.

While one of the Defendants called Boyd Logistics, Inc. to report that some undocumented aliens had apparently sneaked on their trailer in El Paso, the Defendants did not remain at the scene, attempt to give any aid, or summon any help. Instead, Defendants closed the trailer doors and fled the scene. Still inside the trailer were Gaston, Pio Quinto Cabrera ("Cabrera") and Edson Rojas ("Rojas"). Defendants drove another 51 miles to Anna, Texas where they stopped at another Love's Truck Stop. Sprague for the first time entered the trailer and discovered the bodies of Gaston, Cabrera and Rojas. Gaston and Cabrera had died from heat stroke.[4] Rojas was alive, but was hospitalized and remained in a coma for several days necessitating hospitalization for two weeks.

Of the half who were hospitalized some had extended stays in the hospital. The number of aliens hospitalized and the number of severe injuries indicates that had the aliens not gotten out of the trailer when they did, many others could have died as well. To this day, many of the alien victims continue to experience problems with sleeping, memory, and concentration. Many experience feelings of sadness, depression, hopelessness and desperation resulting from their experi-

---

**3.** After the doors were opened at Anna, Texas authorities documented the temperature in the trailer ranging from 110 degrees near the open doors to 150 degrees near the front of the trailer.

**4.** There was testimony at the hearing that Gaston was still breathing when the doors were closed again at the first Love's Truck Stop in Dallas.

ence in the trailer. For example, Esteban Cisneros Ayaujo who was hospitalized for two months, testified that he still experiences memory loss, trembling and a sense of desperation. Victor Manuel Gaeta–Coronado, who was unconscious for seven hours after he was removed from the trailer, was hospitalized for three days. Because Alfredo Cisneros was unconscious on the pavement outside the trailer, he sustained burns on his leg. Cisneros was unconscious for 15 days and spent two months in the hospital. One of the victims, Guillermo Gallo–Lopez, was unconscious and fell from the back of the trailer injuring his head when it struck the pavement. Gallo–Lopez also suffered third degree burns to his body from the scorching hot pavement as he lay there unconscious resulting in severe permanent scarring to his chest, arms and legs which was exhibited to the Court during the hearing. Lopez was hospitalized for four days. Lopez testified that he has not "been able to live in peace from that day to today" and that he feels like "crying all day." Edson Rojas, like many of the victims, testified that he still has nightmares, cannot concentrate properly and cannot remember things as a result of his experience on July 27, 2002.

On November 14, 2002, a Grand Jury for the Eastern District of Texas, Sherman Division, returned a 73–count Second Superceding Indictment against Defendants Troy Phillip Dock and Jason Steven Sprague. Count 1 charged Defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), with conducting the affairs of an enterprise through a pattern of racketeering activity. Count 2 charged Defendants with Interstate Travel in Aid of Racketeering ("ITAR"), in violation of 18 U.S.C. § 1952(a)(3)(B) and 2, § 1956(a)(1)(A)(i), § 1956(h) and 8 U.S.C. § 1324. Count 73 charged Defendants with Conspiracy to Smuggle, Harbor and Transport Illegal Aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)($l$), (a)(1)(B)(iv), 1324(a)(1)(A)(i), 1324(a)(1)(A)(ii), 1324(a)(1)(A)(iii). On March 31, 2003, Defendants pled guilty to Counts 1, 2 and 73 of the Second Superceding Indictment.

After the Probation Department completed a Presentence Investigation Report ("PSR") as to each Defendant, the Government lodged eleven objections to each report (Docket Nos. 220 (Dock) and 221 (Sprague)). On October 7, 2003, the Court conducted an evidentiary hearing on the Government's objections and motions. Having considered the PSRs, the evidence adduced at the evidentiary hearing, the argument of counsel at the hearing and the entire file in this matter, the Court now issues this ruling.

## THE GOVERNMENT'S OBJECTIONS

### The Offense Level for the RICO and ITAR Counts

In the PSR, the probation officer calculated the base offense level for the RICO violation, 18 U.S.C. § 1962(c), pursuant to § 2E1.1 of the United States Sentencing Commission Guidelines Manual ("the Guidelines"). Section 2E1.1 provides that the base offense level for a violation of 18 U.S.C. § 1962 is the greater of 19 or the offense level applicable to the underlying racketeering activity. The probation officer concluded that the underlying activity in this case involved a conspiracy to smuggle, harbor and transport undocumented aliens. According to § 2L1.1(a)(2) of the Guidelines, the base offense level for conspiring to smuggle, harbor and transport undocumented aliens is 12. Thus, the probation officer found that the base offense level for the RICO offense should be 12. The probation officer then proceeded to increase the offense level to 28 due to specific offense characteristics.

As to the ITAR violation, the probation officer calculated the base offense level

pursuant to § 2E1.2. Section 2E1.2 provides that the base offense level for a violation of 18 U.S.C. § 1952 is the greater of 6 or the offense level applicable to the underlying crime of violence or other unlawful activity in respect to which the travel or transportation was undertaken. The probation officer concluded that the underlying activity as to the ITAR count was a violation of 18 U.S.C. § 1956, conspiracy to commit money laundering.[5] According to § 2S1.1 of the Guidelines, the base offense level for a violation of 18 U.S.C. § 1956 is determined "by the underlying offense from which the laundered funds were derived if, (A) the defendant committed the underlying offense ...; and (B) the offense level can be determined." The probation officer found that because the underlying offense was a conspiracy to smuggle, harbor and transport illegal aliens, § 2L1.1(a)(2) applies and, as determined for Count One, the base offense level for the ITAR count is 28 and the adjusted offense level is 30 due to certain specific offense characteristics.

In objections one and two, the Government vigorously disputes the probation officer's conclusion as to the offense level for the RICO offense and the ITAR offense. The Government contends that the probation officer failed to take application note 2 to § 2E1.1 (RICO) and § 2E1.2 (ITAR) into account. Application note 2 to both the RICO and ITAR guidelines provides that "[i]f the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used." U.S. SENTENCING GUIDELINES MANUAL § 2E1.1 & 2E1.2, comment. (n. 2) (Nov.2002).

Concerning the RICO offense charged in Count One, the Government contends that first degree murder under 18 U.S.C. § 1111,[6] the federal murder statute, is the most analogous federal offense because state felony murder, Tex. Pen.Code § 19.02(b)(3),[7] is specifically referred to in predicate racketeering acts 30[8] and 31 under Count 1. As to the ITAR offense charged in Count Two,[9] the Government contends that first degree murder under

5. The indictment alleged, in part as to Count Two, that Defendants "traveled in interstate commerce, with the intent to promote and carry on an unlawful activity, that is, Conspiracy to Commit the Offense of Money Laundering."

6. 18 U.S.C. § 1111 states:
   Murder is the unlawful killing of a human being with malice aforethought. Every murder ... committed in the perpetration of, or attempt to perpetrate any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary or robbery ... is murder in the first degree.

7. Section 19.02(b)(3) provides:
   (b) A person commits an offense if he:
   ....
   (3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly danger-

ous to human life that causes the death of an individual.
   In racketeering acts 30 and 31, the felony underlying the application of § 19.02(b)(3) is a violation of § 20.05 of the Texas Penal Code, which provides that a "person commits an offense if the person for pecuniary benefit transports an individual in a manner that: (1) is designed to conceal the individual from local, state, or federal law enforcement authorities; and (2) creates a substantial likelihood that the individual will suffer serious bodily injury or death."

8. For example, racketeering act 30 alleged that Defendants violated § 20.05 of the Texas Penal Code and in the course of committing that felony did intentionally and knowingly commit an act clearly dangerous to human life that caused the death of Jose Gaston.

9. In Count Two, Defendants were charged with violating 18 U.S.C. § 1952(a)(3)(B) and (2), which provides:
   (a) whoever travels in interstate or foreign commerce ... with intent to:

18 U.S.C. § 1111 is the most analogous federal offense because Count Two specifically refers to state felony murder, Tex. Pen.Code § 19.02(b)(3), as the "crime of violence" element, 18 U.S.C.1952(a)(2), of the ITAR offense. The Government points out that when the Defendants pled guilty to both counts, they were advised by the court of all the elements of the offenses and predicate offenses, including state felony murder. The Government further points out that the factual resume underlying the pleas of the Defendants supports its position that the predicate offense of state felony murder was committed by Defendants during the commission of the RICO and ITAR offenses.

The Government further argues that once it is determined under application note 2 that first degree murder is the most analogous federal offense to the charged state felony murder, the Court need not proceed any further and should use a base offense level of 43, the base offense level for first degree murder, for the RICO count. U.S.S.G. § 2A1.1. While the Court agrees with the Government that the PSRs miscalculate the offense level for these counts, the Court arrives at its conclusion in a different manner from the Government and the Court does not agree that a base offense level of 43 is appropriate.

As to the RICO count,[10] the Court first notes that Defendants were charged with six racketeering acts, 28–32(b), underlying the charged violation of 18 U.S.C. § 1962(c).[11] Racketeering act 28 alleged that Defendants engaged in alien transportation as set forth in Counts 46–72 in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(II), 1324(a)(1)(B)(iv). In Count 46 and Counts 49–72,[12] Defendants were charged with illegally transporting a specific alien in each count. Racketeering act 29 alleged that Defendants engaged in

---

. . . .
(2) commit any crime of violence to further any unlawful activity; or
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform—
. . . .
(B) an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life.

10. The Court's analysis as to the RICO count set forth below is essentially the same as the analysis applicable to the ITAR count. U.S.S.G. § 2E1.2, comment. (n. 1) Thus, the Court finds it unnecessary to conduct a detailed analysis of the offense level applicable to the ITAR count.

11. 18 U.S.C. § 1962(c) provides:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "Racketeering activity" means "(A)any act involving murder ... which is chargeable under State law and punishable by imprisonment for more than one year ... (B) any act which is indictable under any of the following provisions 18, United States Code: ... section 1956 (relating to the laundering of monetary instruments) ... or (F) any act which is indictable under the Immigration and Naturalization Act, section 274 (relating to the bringing in and harboring of certain aliens)."

12. The Court is excluding those counts that specifically referred to Gaston and Cabrera as those offenses are dealt with in the racketeering acts 30 and 31.

a conspiracy to smuggle, harbor and transport illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(*l*), (a)(1)(B)(iv), 1324(a)(1)(A)(i), 1324(a)(1)(A)(ii), 1324(a)(1)(A)(iii).[13] Racketeering act 30 charged Defendants with state felony murder in relation to the death of Jose Gaston and racketeering act 31 charged Defendants with state felony murder in relation to the death of Pioquinto Cabrera. Racketeering act 32(a) charged Defendants with money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 2. Racketeering Act 32(b) alleged that Defendants engaged in a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Defendants pled guilty to each of these racketeering acts during their plea colloquy.

■ Turning to the Guidelines, the Court begins with § 2E1.1 of the Guidelines which provides that the base offense level is determined by the greater of 19 or the offense level applicable to the underlying racketeering activity. Application Note 1 to § 2E1.1 provides the following:

> Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2). To determine whether subsection (a)(1) or (a)(2) results in the greater offense level, apply Chapter Three, Parts A, B, C, and D to both (a)(1)(a)(2). Use whichever subsection results in the greater offense level.

U.S.S.G. § 2E1.1 comment. (n. 1). Thus, to determine the offense level for the "underlying racketeering activity" under § 2E1.1(a)(2), the Court must turn to the "grouping rules" pertaining to multiple counts set forth in Chapter 3, Part D. Section 3D1.1 provides that when a defendant has been convicted of more than one count, the court shall group the counts resulting in conviction into distinct "Groups of Closely Related Counts" by applying the rules specified in § 3D1.2. Then, the court must calculate the offense level for each offense within the group. The highest offense level is the offense level for that group. U.S.S.G. § 3D1.3. Once that is accomplished, the court must determine the combined offense level among the groups by increasing the highest offense level among the groups by an amount based on the number of "units," which depends on the number and severity of the other groups.[14] U.S.S.G. § 3D1.4.

■ Therefore, the Court considers predicate racketeering acts 28–32(b) as "pseudo-counts" of the indictment. *U.S. v. Nguyen*, 255 F.3d 1335, 1341 (11th Cir. 2001); *U.S. v. Morgano*, 39 F.3d 1358, 1366 (7th Cir.1994); *U.S. v. Sacco*, 899 F.2d 149, 151 (2nd Cir.1990); *U.S. v. Harmon*, 995 F.Supp. 963, 964 (E.D.Ark.1998). Because racketeering acts 28, 29, and 32(a)-(b) involved "substantially the same harm," as that term is defined in § 3D1.2,[15] the Court groups them into one

---

13. Defendants were charged with conspiracy to smuggle, harbor and transport illegal aliens in count 73 of the indictment.

14. In order to determine which group has the highest offense level and then the combined offense level, it is necessary to include appropriate upward adjustments from Chapter 3, Parts A–C. The Court will explain below why these adjustments are proper in this case.

15. In the Court's view, the grouping of these racketeering acts together is appropriate because these offenses generally vindicate society's interest in prohibiting illegal

immigration activity. *See* U.S.S.G. § 3D1.1, comment. (n. 2) ("For offenses in which there are no identifiable victims (e.g. drug or immigration offenses, where society at large is the victim), the 'victim' for purposes of subsections (a) and (b) is the societal interest that is harmed."); *United States v. Jose–Gonzalez*, 291 F.3d 697, 707 (10th Cir. 2002) ("The reason for grouping offenses covered by § 2L1.1 [the guideline applicable to violations of 8 U.S.C. § 1324] is that all such offenses share the same single victim— the societal interest in controlling immigration."). Racketeering acts 30 and 31, how-

group ("the transport group"). As to racketeering acts 30 and 31, the state felony murder, the Court finds that under application note 2 to § 2E1.1, the most analogous federal offense is second degree murder.[16] Because second degree murder falls within Chapter Two, Part A of the Guidelines and is therefore excluded from the operation of 3D1.2, the Court considers each one of these separately from the group referred to above.

Next, the Court must determine the offense level for the transport group and that for second degree murder. The highest offense level within the transport group is that for the money laundering

offense involving Edson Rojas with an offense level of 34.[17] U.S.S.G. § 3D1.3(a). The base offense level for second degree murder is 33. After the adjustments under Chapter 3, Parts A–C, the offense level attributable to the second degree murder in this case is 41. Pursuant to § 3D1.2, because second degree murder is the highest offense level it counts as 1 unit. Then, another unit is added because there is another second degree murder that must be accounted for. Because the offense level for the transport group is within seven levels of the offense level for second degree murder, ½ of a unit is added for a total of 2 and ½ units. Thus, the offense level is raised by three levels from 41 to 44. U.S.S.G. § 3D1.4.[18]

ever, have a human victim. *See* U.S.S.G. 3D1.2, comment. (backg'd) ("Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count should be treated separately rather than grouped together."); *Jose–Gonzalez*, 291 F.3d at 707 ("When, however, the gist of the offense is injury to persons, the offense against each human victim belongs in a different group, even when the offenses arose out of a single event.") Therefore, these acts should be treated separately from acts that involve a societal interest as the "victim."

16. The Court disagrees with the Government's assertion that first degree murder is the most analogous federal offense to the state felony murder charged in this case. The underlying felony at issue is unlawful transport under Tex. Pen.Code § 20.05. This felony is not enumerated as one which can support a finding of first degree murder under 18 U.S.C. § 1111 and it is not one that is easily analogized to the felonies listed in § 1111. While the Court recognizes that it is not bound by the constraints of § 1111 at sentencing, *U.S. v. Nichols*, 169 F.3d 1255, 1273 (10th Cir.1999), the Court is reluctant to expand the scope of first degree murder to encompass a felony that is rather dramatically dissimilar to those listed in § 1111. *Id.* ("The doctrine of felony murder expressed a highly artificial concept that generally deserves no extension beyond its required application."). With that said, however, the Court notes that

§ 1111 provides that all murder not enumerated in subsection (a) is second degree murder and that it has been held that second degree murder encompasses the death of an individual that occurs during the commission of a felony not enumerated in subsection (a). *U.S. v. Chanthadara*, 230 F.3d 1237, 1258 (10th Cir.2000). Thus, the Court concludes that second degree murder is the most analogous federal offense to the state felony murder charged in this case.

17. Pursuant to § 2S1.1, the base offense level is calculated pursuant to § 2L1.1 and then two levels are added due to conviction under 18 U.S.C. § 1956.

| | |
|---|---|
| Base offense level (2L1.1(a)(2)) | 12 |
| Number of Aliens (2L1.1(b)(2)(B)) | +6 |
| Substantial Risk of Death or Bodily Injury (2L1.1(b)(5)) | +2 |
| Permanent or Life–Threatening Injury (2L1.1(b)(6)(3)) | +6 |
| Vulnerable Victim (3A1.1(b)(1)) | +2 |
| Special Skill (3B1.1) | +2 |
| Restraint of Victim (3A1.3) | +2 |
| Conviction Under 18 U.S.C. § 1956 | +2 |
| Total | 34 |

18. Determining the Combined Offense Level

The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table:

| Number of Units | Increase in Offense Level |
|---|---|
| 1 | None |
| 1½ | add 1 level |

Therefore, for purposes of § 2E1.1(a)(2), the "offense level for the underlying racketeering activity" is 44, the combined offense level for the transport group and second degree murder counts. Further, because 44 is greater than 19, the Court will use the combined offense level calculated above as the offense level for the RICO and ITAR counts. Accordingly, the Court sustains the Government's objections one and two. The Court now turns to an explanation of the appropriate upward adjustments under Chapter 3, Parts A–C of the guidelines.

### Vulnerable Victims

▪ In objection number 3, the Government argues that a four level vulnerable victim adjustment pursuant to § 3A1.1(b)(1)-(2) is appropriate. The Court finds that such an increase is called for and sustains the Government's objection.[19] Application note 2 provides, in part, that a "vulnerable victim" is one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." The evidence adduced at the sentencing hearing shows that although the fifty individuals, including six minors, who were in Dock and Sprague's trailer entered the United States illegally and entered the trailer willingly, they were "particularly susceptible" to the criminal conduct that led to their injuries, including, but not limited to, the deaths of Gaston and Cabrera.

After paying between $1000.00 and $1,900.00 to be brought into the United States and transported to the interior of the country, the aliens were first housed in two mobile homes with only two bathrooms in a remote part of New Mexico. They were instructed by indicted co-defendants not to call attention to themselves lest the authorities discover the smuggling operation. They were made to pay for their food, which consisted of only beans and Ramen noodles. Some of the aliens had been in the mobile homes for over two weeks waiting for transport to the interior of the United States. In many respects they were trapped by their circumstances. Then when Defendants arrived with their trailer in the early morning hours of July 27, and the fifty aliens were crowded into a two to three foot space at the top of an unventilated trailer, and the trailer padlocked from the outside, they were indeed "particularly susceptible" to the criminal conduct which would be inflicted upon them over the next twelve hours. Although they had entered this country illegally, the aliens were desperate to the point that they had then had little control over their own fate and were at the mercy of those to whom they had entrusted their

| | |
|---|---|
| 2 | add 2 levels |
| 2½–3 | add 3 levels |
| 3½–5 | add 4 levels |
| More than 5 | add 5 levels |

In determining the number of Units for purposes of this section:

(a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious.

(b) Count as one-half Unit any Group that is 5 to 8 levels less serious than the Group with the highest offense level.

19. The Court recognizes that it earlier drew a distinction between offenses where society is the victim and those which involve human

victims. While this is generally the case, the violations of immigration laws in this case resulted in extensive injury and suffering to human victims and, therefore, consideration of facts underlying the treatment of the human victims is appropriate. *Cf. Jose–Gonzalez,* 291 F.3d at 707–08 (in alien transportation case involving multiple deaths and injuries, district court acted properly in treating each death and injury as a "pseudo-count" so that offense level increases that protect human life could be implemented) Thus, rather than solely considering the plight of Gaston and Cabrera, the Court will consider the plight of the other aliens as well.

passage. In other words, these individuals were in many ways unable to help themselves or to change their present situation and were disadvantaged to such a degree that each of them was faced with little choice but to follow the orders of the defendants and their indicted co-conspirators.

While the Court recognizes that Dock and Sprague may not have known all of the facts leading up to the loading of the aliens on July 27, the Court finds that Dock and Sprauge knew or should have known of the aliens' susceptibility to the criminal conduct they were engaged in. U.S.S.G. § 3A1.1(b). Put simply, Dock and Sprague and their co-defendants preyed on these individuals' obviously desperate situation for their own profit. This desire for money led Dock and Sprague to engage in conduct that failed to recognize basic human needs and eventually resulted in the deaths of two individuals. Thus, a four level vulnerable victim increase is appropriate. *See United States v. Brunson,* 54 F.3d 673, 676 (10th Cir.1995) (" 'vulnerable victims' are those who are in need of greater societal protection").

### Restraint of Victim

■ In objection number 4, the Government contends that a two level restraint of victim increase pursuant to § 3A1.3 is appropriate. The Court finds that such an adjustment is appropriate and sustains the Government's objection. The evidence presented at the sentencing hearing shows that when Sprague opened the trailer in Dallas and the aliens spilled out of the trailer, the aliens told him that people were still inside the trailer. Rojas testified that he screamed for help and yet, neither Sprague or Dock entered the trailer. Instead, they closed the trailer door and drove off leaving these three victims

for over two hours longer. There was evidence at the hearing that Gaston was still alive when the trailer doors closed in Dallas. When the authorities opened the trailer in Anna, they discovered the bodies of Gaston and Cabrera and Edison Rojas still alive. This evidence justifies the two level adjustment for restraint of these victims.

### Special Skill

■■ In objection number 5, the Government contends that a two level special skill increase pursuant to § 3B1.3 is appropriate. The Court finds that such an adjustment is appropriate and sustains the Government's objection. "Special skill" is defined as a "skill not possessed by members of the general public and usually requiring substantial education, training or licensing." Defendants were trained and licensed truck drivers who drove eighteen-wheelers for a living. The very purpose of their profession is the safe delivery of their cargo, be it medical supplies, furniture, or cattle, much less the priceless human cargo they undertook to transport. The illegality of their actions, does not lessen their responsibility to safely transport their cargo using the special skills and training they possessed in order to be licensed commercial long haul truck drivers. Numerous courts have held that skills necessary to operate an eighteen-wheeler justify enhancement under this section. *See, e.g., United States v. Smith,* 332 F.3d 455, 459 (7th Cir.2003). The only question is whether Defendants' special skill in operating an eighteen-wheeler significantly facilitated the commission or concealment of the offense. The Court finds that it did.

The evidence introduced in this case, including the transcript of the Ruben Valdes'[20] trial, demonstrates that the

---

**20.** Valdes was the ringleader of the alien smuggling ring Dock and Sprague became involved in.

smuggling operation Dock and Sprague became involved in could not have existed without truck drivers, such as themselves, willing to transport large numbers of aliens for money and other favors. Truck drivers' access to eighteen-wheelers, their skill in operating them, their knowledge of how border patrol checkpoints operate, and their knowledge of how individuals could be transported safely in a trailer, among other things, was integral to the viability and profitability of the ongoing smuggling operation. Without Defendants' special skill in operating an eighteen-wheeler, the events that led to the deaths of Gaston and Cabrera and the injuries to the other aliens would not have occurred. Accordingly, the enhancement is appropriate.

### The Government's Remaining Objections

Government objection number 6 is overruled, and objections 7–11 are overruled as moot.

### CONCLUSION

After applying the vulnerable victim, restraint of victim, and special skill adjustments, the offense level for the racketeering and ITAR counts is 44. With a three level decrease for acceptance of responsibility, the offense level for both Defendants for these counts is 41.